**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com
          sbeck@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.A., individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WISP, INC., and META PLATFORMS, INC., | |
| Defendants. | |

Plaintiff A.A. ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendants Wisp, Inc. ("Wisp") and Meta Platforms, Inc. ("Facebook")[1] (together with Wisp, "Defendants").  Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all patients who accessed and used www.hellowisp.com (the "Website") to purchase medication.

2.      Wisp promises to provide consumers with "healthcare on your terms."[2]  Through its Website, Wisp offers convenient access to prescription and over-the-counter medications for the treatment of sexual and reproductive health issues.

3.      Information concerning an individual's healthcare and prescription medications is protected by state and federal law.

4.      Despite these protections, Wisp aided, employed, agreed, and conspired with Facebook to intercept sensitive and confidential communications sent and received by Plaintiff and members of the putative class.  This includes communications that reveal patients' health conditions and prescribed medications.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## PARTIES

5.      Plaintiff A.A. is a California citizen who resides in San Diego, California.  On August 25, 2023, Plaintiff was prescribed and ordered Norethindrone birth control medication through Defendant Wisp's Website.  Unbeknownst to Plaintiff, Wisp disclosed her confidential prescription information to Facebook through software code known as the Facebook Tracking Pixel, as described below.  Due to the surreptitious nature of the interceptions at issue, Plaintiff did not realize information related to her prescription information was disclosed to third parties until

---

[1]  In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."
[2]  WISP, https://hellowisp.com/about.

August 2024.  Plaintiff was in California when she ordered prescription medication through the Website.

6.    During the time Plaintiff used the Website, she maintained an active social media account with Facebook.  Plaintiff used the same device to access the Website and her Facebook account.  Subsequently, as a result of the conduct of Defendants, she received targeted advertisements on Facebook relating to sexual and reproductive health medications.

7.    Pursuant to the systematic process described herein, Wisp assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information ("PII"), protected health information (or "PHI").  This includes information related to the specific prescriptions ordered by consumers.  Defendant Wisp assisted Facebook's interceptions without Plaintiff's knowledge, consent, or express written authorization.

8.    By failing to receive the requisite consent, Wisp breached its duty of confidentiality and aided Facebook in unlawfully intercepting Plaintiff's PII and PHI.

9.    Such acts are egregious violations of Plaintiff's right to privacy.

10.    Defendant Wisp, Inc. is incorporated in Delaware with its principal place of business in San Francisco, California.  Defendant Wisp owns and operates the Website www.hellowisp.com.  Defendant Wisp provides telehealth and prescription medication services.  Defendant Wisp embedded tracking software known as the Facebook Tracking Pixel on its Website, as described in more detail below.  Defendant Wisp embedded this tracking technology on its Website for advertising purposes.

11.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business located in Menlo Park, California.  Defendant Facebook at all times knew that the incorporation of its software into the Wisp Website would result in its interception of PHI and other sensitive data.  Defendant Facebook, as the creator of its software and the Facebook Tracking Pixel, knew that it intercepted each of a users' interactions on the Website that incorporated its technology.  Defendant Facebook has consistently come under scrutiny for incorporating its technology on websites that involve the transmittal of sensitive data, including health information, but continues to do so.

1

**JURISDICTION AND VENUE**

2      12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as

3  modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as

4  defined below, is a citizen of a different state than the Defendants, there are more than 100

5  members of the Class, and the aggregate amount in controversy exceeds $5,000,000.00 exclusive

6  of interest and costs.

7      13.     This Court has personal jurisdiction over the parties because the parties reside in

8  California, are California citizens, and submit to the jurisdiction of the Court.  Further, Defendants

9  have, at all times relevant hereto, systematically and continually conducted business in California,

10 including within this District, and intentionally availed themselves of the benefits and privileges of

11 the California consumer market through the promotion, marketing, and sale of its services to

12 residents within this District and throughout California.  Additionally, Plaintiff, while in California,

13 ordered prescription birth control through the Website.

14     14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants

15 transact significant business within this District and Defendants reside in this District.

16

**FACTUAL ALLEGATIONS**

17     **A.     Background of the California Information Privacy Act ("CIPA")**

18     15.     The CIPA, California Penal Code Section 630, *et seq.*, prohibits aiding or permitting

19 another person to willfully—and without the consent of all parties to a communication—read or

20 learn the contents or meaning of any message, report, or communication while the same is in transit

21 or passing over any wire, line, or cable, or is being sent from or received at any place within

22 California.

23     16.     To establish liability under California Penal Code Section 631(a), a plaintiff need

24 only establish that the defendant, "by means of any machine, instrument, or contrivance, or in any

25 other manner," does any of the following:

26
          Intentionally taps, or makes any unauthorized connection, whether physically,
27        electrically, acoustically, inductively or otherwise, with any telegraph or telephone
          wire, line, cable, or instrument, including the wire, line, cable, or instrument of any
28        internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable, or is being sent from, or received at any place within this state,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

17.    Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (the CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (the CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607–08 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

18.    Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation under the CIPA. Cal. Penal Code § 637.2.

**B.    Background of the California Confidentiality of Medical Information Act ("CMIA")**

19.    Under the CMIA a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).[3]  "An authorization for the release of medical information . . . shall be valid if it:

(1) Is handwritten or is in a typeface no smaller than 14-point type.

(2) Is clearly separate from any other language present on the same page and is

---

[3] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place. For example, Defendant Wisp could bypass the authorization requirement if patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena. *See* Cal. Civ. Code §§ 56.10(b)(3) & 56.10(b)(6).

executed by a signature that serves no other purpose than to execute the authorization.

(3) Is signed . . . and dated . . .

(4) States the specific uses and limitations on the types of medical information to be disclosed.

(5) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(6) States the name or functions of the persons or entities authorized to receive the medical information.

(7) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(8) States an expiration date or event . . . .

(9) Advises the person signing the authorization of the right to receive a copy of the authorization."[4]

20.     Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and PHI.  Cal. Civ. Code § 56.36(c).[5]  Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages to sue.  Cal. Civ. Code § 56.36(b). The California Third District Court of Appeal emphasized this in *Sutter Health*:

> In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) . . . nominal damages of one thousand dollars ($1,000).  In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or

---

[4] Cal. Civ. Code § 56.11(b).
[5] "Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care . . . who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."  Cal. Civ. Code § 56.101(a).

was threatened with actual damages.  [¶] (2) The amount of actual damages, if any, sustained by the patient.[6]

**C.     Defendant Facebook's Platform and Business Tools**

21.     Facebook describes itself as a "real identity platform,"[7] meaning users are allowed only one account and must share "the name they go by in everyday life."[8]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[9]

22.     In 2023, Facebook generated over $134 billion in revenue.[10]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[11]

23.     Facebook sells advertising space by highlighting its ability to target users.[12] Facebook can target users effectively because it surveils user activity on and off its site.[13]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[14]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[15]

---

[6] *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551 (2014) (quoting Cal. Civ. Code § 56.36(b)).

[7] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL ST. J. (Oct. 21, 2021, 4:05 PM), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[8] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[9] FACEBOOK, SIGN UP, https://www.facebook.com.

[10] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS; INITIATES QUARTERLY DIVIDEND, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend-2024.pdf at 8.

[11] *Id.*

[12] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[13] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[14] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[15] FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

24.     Advertisers can also build "Custom Audiences."[16]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[17]  With Custom Audiences, advertisers can target existing customers directly and build "Lookalike Audiences," which "leverage[] information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities."[18]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: (1) by manually uploading contact information for customers or (2) by utilizing Facebook's "Business Tools."[19]

25.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[20]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

26.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[21]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can

---

[16] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[17] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.
[18] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[19] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK,
CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[20] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.
[21] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED,
https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES
FOR META PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK,
META FOR DEVELOPERS: MARKETING API - APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.

---

choose, including what content a visitor views or purchases.[22]  Advertisers can even create their

own tracking parameters by building a "custom event."[23]

27.    One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece

of code to advertisers, like Wisp, to integrate into their website.  As the name implies, the

Facebook Tracking Pixel "tracks the people and type of actions they take."[24]  When a user accesses

a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs

the user's browser to contemporaneously send a separate message to Facebook's servers.  This

second secret and contemporaneous transmission contains the original GET request sent to the host

website, along with additional data that the Facebook Tracking Pixel is configured to collect.  This

transmission is initiated by Facebook code and concurrent with the communications with the host

website.  At relevant times, two sets of code were thus automatically run as part of the browser's

attempt to load and read Wisp's Website—Wisp's own code and Facebook's embedded code.

28.    Wisp chose to include the Facebook Tracking Pixel on its Website.

29.    Facebook's own documentation makes clear how extensively the Facebook

Tracking Pixel tracks private information.  It describes the Facebook Tracking Pixel as code that

Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the

right people[] [and] *[f]ind . . . people who have visited a specific page or taken a desired action on*

*your website*" (emphasis added).[25]

30.    Facebook instructs such business customers that:

Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log when someone
takes an action on your website***.  Examples of actions include adding an item to their
shopping cart or making a purchase.  ***The Pixel receives these actions, or events***,
which you can view on your [Facebook Tracking] Pixel page in Events Manager.
From there, you'll be able to see the actions that your customers take.  ***You'll also
have options to reach those customers again through future Meta ads***.[26]

[22] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[23] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*
FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.
[24] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[25] META, ABOUT META PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[26] *Id.* (emphasis added).

31.    This tracked information includes private data revealing prescribed medications purchased by consumers on Defendant Wisp's Website.

32.    The Facebook Tracking Pixel code enables Facebook not only to help Wisp with advertising to its own patients outside the Website, but also includes individual patients among groups targeted by *other* Facebook advertisers relating to the conditions about which patients communicated on Wisp's Website.

33.    Facebook's Business Help Center explains:
Meta ***uses event data to show ads to people who are likely to be interested in them***. One type of marketing data is website events, which are ***actions that people take on your website***.[27]

34.    In other words, Facebook sells advertising space by highlighting its ability to target users.[28]  Facebook can target users so effectively because it surveils user activity both on and off its site.[29]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behaviors," and connections.[30]

35.    An example illustrates how the Facebook Tracking Pixel works.  Take an individual who, at relevant times, navigated to Wisp's Website and clicked on a link to purchase prescription medication.  When that link was clicked, the individual's browser sent a GET request to Wisp's server requesting the server to load the particular webpage.  As a result of Wisp's use of the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening.  Facebook caused the browser to secretly duplicate the communication with Wisp, transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity.

---

[27] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).
[28] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited May 21, 2024).
[29] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[30] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

36.    After collecting and intercepting the information described in the preceding paragraph, Facebook processed, analyzed, and assimilated it into datasets like Core Audiences and Custom Audiences.

**D.    How Defendant Wisp Disclosed Plaintiff's and Class Members' Protected Health Information and Assisted with Intercepting Communications**

37.    Through the Facebook Tracking Pixel, Defendant Wisp shared its patients' identities and online activity, including information related to patients seeking sexual and reproductive medications, with the world's largest social media company for targeted advertising purposes.

38.    Defendant Wisp allows individuals to order prescriptions related to their sexual and reproductive health on its Website.

**Figure 1**:



39.    Defendant offers a host of medications, including medications for birth control, feminine health, and sexually transmitted diseases.

40.    Undoubtedly, consumers expect this information to remain private and confidential.

41.    When a consumer purchases medication through the Wisp Website and begins the checkout process, Defendant Wisp transmits to Facebook through the Facebook Tracking Pixel the

1  fact that the individual is purchasing a medication as well as the name of the medication.

2      42.    For example, Defendant Wisp incorporated the Facebook Tracking Pixel on its

3  Website, allowing Defendant Facebook to intercept and record "AddToCart" and

4  "SubscribedButtonClick" events, which detail information about which products the patient was

5  purchasing on Defendant Wisp's Website.

6      43.    Specifically, when a consumer purchases birth control products from the Wisp

7  Website, the AddToCart event information shared with Facebook includes the terms "hellowisp,"

8  "birth control," and "tri-sprintec." *See* Figure 2.

9  **Figures 2:**

10     "status": "COMPLETE",
       "method": "GET",
11     "protocolVersion": "HTTP/2.0",
       "scheme": "https",
       "host": "www.facebook.com",
       "actualPort": 443,
12     "path": "/tr/",
       "query": "id=2538973439161080&ev=AddToCart&dl=https%3A%2F%2Fhellowisp.com%2Fproducts%2Ftri-sprintec-birth-
13     control%3Fflow%3Dopen&rl=&if=false&ts=1713302543339&cd[content_type]=product&cd[content_ids]=%5B%22BU-A-OT-LF%2C%2C%22HL2-OT-
       SH%22%2C%22TSP3-SUB-SH%22%2C%22OM1-A-SUB-SH%22%5D&cd[value]=158.66&cd[currency]=USD&sw=1920&sh=1080&v=2.9.153&r=stable&a=tmSimo-GTM-
14     WebTemplate&ec=13&o=4126&fbp=fb.1.1713302395193.2211020712&ler=empty&cd1=API_unavailable&it=1713302395143&coo=false&tm=1&rqm=GET",
       "tunnel": false,
15     "keptAlive": true,
       "webSocket": false,
       "remoteAddress": "www.facebook.com/31.13.67.35",
16     "clientAddress": "/127.0.0.1",
       "clientPort": 53981,
       "times": {
17         "start": "2024-04-16T17:22:23.355-04:00",
           "requestBegin": "2024-04-16T17:22:23.355-04:00",
           "requestComplete": "2024-04-16T17:22:23.356-04:00",
           "responseBegin": "2024-04-16T17:22:23.364-04:00",

18     44.    Similar data is intercepted by Facebook when a patient completes the checkout

19  process on the Website through the "SubscribedButtonClick" event, notifying Facebook that the

20  medication was purchased.

**Figure 3:**



45.    Each time Defendant Wisp sent this activity data through the Facebook Tracking Pixel, it also disclosed a patient's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Facebook admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

46.    A user who accessed Defendant Wisp's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contains that user's unencrypted FID.

47.    When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

48.    One such cookie was the "fr cookie" which contained, at least, an encrypted FID

and browser identifier.[31]  Facebook, at a minimum, used the fr cookie to identify users.[32]

49.     If a visitor had never created an account, an even smaller set of cookies was transmitted.

50.     At each stage, Defendant Wisp also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[33]

51.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[34]  Otherwise, the c_user cookie is cleared when the browser exits.[35]

52.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[36]  If that happens, the time resets, and another 90 days begins to accrue.[37]

53.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[38]  If that happens, the time resets, and another 90 days begins to accrue.[39]

54.     The Facebook Tracking Pixel used both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant Wisp's Website.[40]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[41]  The _fbp cookie was always transmitted as a first-party cookie.  A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

55.     Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to FIDs and

[31] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[32] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.
[33] *Id.*
[34] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.
[35] *Id.*
[36] *See id.*
[37] Confirmable through developer tools.
[38] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://mbasic.facebook.com/privacy/policies/cookies/printable/#annotation-1.
[39] Also confirmable through developer tools.
[40] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[41] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

corresponding Facebook profiles.  Defendant Wisp sent these identifiers alongside the event data.

56.    Plaintiff's offsite activity report from her personal Facebook account confirms that her sensitive, confidential, and protected information was intercepted by Facebook through Defendant Wisp's Website.

57.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendants to disclose her PII and PHI.  Plaintiff was never provided with any written notice that Defendant Wisp disclosed the PII or PHI of users of the Website, nor was she provided any means of opting out of such disclosures.  Defendant Wisp nonetheless knowingly disclosed Plaintiff's PII and PHI, and assisted Defendant Facebook in unlawfully intercepting this private information for targeted advertising purposes.

58.    By law, Plaintiff is entitled to privacy in her protected health information and confidential communications.  Defendants deprived Plaintiff of her privacy rights when they: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications, personally identifiable information, and protected health information; (2) disclosed and/or intercepted patients' protected health information; and (3) undertook this pattern of conduct without notifying Plaintiff and without obtaining her express written consent.

## CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as all natural persons in California who, during the class period, had a Facebook account and purchased medication on www.hellpwisp.com (the "Class").

60.    Plaintiff reserves the right to modify the class definitions or add sub-classes as necessary prior to filing a motion for class certification.

61.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

62.     Excluded from the Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

63.     <u>Numerosity</u>.  Members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendants' records.

64.     <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Class because Plaintiff used www.hellowisp.com to purchase prescription birth control and had her personally identifiable information and protected health information disclosed to Facebook without her express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class members.

65.     <u>Adequacy</u>.  Plaintiff is prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

66.     <u>Commonality</u>.  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Questions of law and fact common to the Class include:

     a.     Whether Defendants intentionally tapped the lines of internet communication between patients and their healthcare provider;

     b.     Whether Defendant Wisp's Website surreptitiously recorded personally identifiable

information, protected health information, and related communications and
subsequently, or simultaneously, disclosed that information to Facebook;

c.    Whether Facebook is a third-party eavesdropper;

d.    Whether Defendants' disclosures of personally identifiable information, protected
health information, and related communications constituted an affirmative act of
communication;

e.    Whether Defendant Wisp's conduct, which allowed Facebook—an unauthorized
person—to view Plaintiff's and Class Members' personally identifiable information
and protected health information, resulted in a breach of confidentiality;

f.    Whether Defendants violated Plaintiff's and Class Members' privacy rights by using
the Facebook Tracking Pixel to record and communicate patients' confidential
medical communications;

g.    Whether Plaintiff and Class Members are entitled to damages under CIPA, the
CMIA, or any other relevant statute; and

h.    Whether Defendants' actions violated Plaintiff's and Class Members' privacy rights
as provided by the California Constitution.

60.    Superiority.  Class action treatment is the superior method for the fair and efficient
adjudication of this controversy.  Such treatment permits a large number of similarly situated
persons to prosecute their common claims in a single forum simultaneously, efficiently, and
without the unnecessary duplication of evidence, effort, or expense that numerous individual
actions would engender.  The benefits of proceeding through the class mechanism, including
providing injured persons or entities a method for obtaining redress on claims that could not
practicably be pursued individually, substantially outweigh any potential difficulties in the
management of this class action.  Plaintiff knows of no special difficulty to be encountered in
litigating this action that would preclude its maintenance as a class action.

**COUNT I**
**Violation of the California Confidentiality of Medical Information Act,**
**Cal. Civ. Code § 56.10**

67.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set

1    forth herein and brings this claim individually and on behalf of the proposed Class against

2    Defendant Wisp.

3        68.    Under the California Confidentiality of Medical Information Act (the "CMIA"),

4    California Civil Code Section 56.10, providers of health care are prohibited from disclosing

5    medical information relating to their patients without a patient's authorization.  Medical

6    information refers to:

7        any individually identifiable information, in electronic or physical form, in possession
         of or derived from a provider of health care . . . regarding a patient's medical history
8        . . . reproductive or sexual health application information, mental or physical
         condition, or treatment.  'Individually Identifiable' means that the medical
9        information includes or contains any element of personal identifying information
         sufficient to allow identification of the individual . . . .[42]
10

11       69.    Plaintiff and Class Members are patients under the definition of the CMIA because

12   Plaintiff and Class Members received "health care services from a provider of health care" and the

13   information Wisp shared to Facebook was "medical information pertain[ing]" to Plaintiff and Class

14   Members.  Cal. Civ. Code § 56.05(m).

15       70.    Defendant Wisp is a "provider of health care" as defined in CMIA section 56.05(p)

16   because it offers prescription medications for sexual and reproductive health.  Defendant Wisp is

17   also considered a "provider of health care" under the CMIA because its Website maintains medical

18   information and offers software to consumers that is designed to maintain medical information for

19   the purposes of allowing its users to manage their information or make the information available to

20   a health care provider, or for the diagnosis, treatment, or management of a medical condition. Cal.

21   Civ. Code § 56.06(a)–(b).

22       71.    Therefore, as a provider of health care, Defendant Wisp is subject to the

23   requirements of the CMIA and had an ongoing obligation to comply with the CMIA's requirements

24   regarding the maintenance of its user's medical information.

25       72.    As set forth above, a Facebook ID is an identifier sufficient to allow identification

26   of an individual.  Along with patients' Facebook ID, Wisp disclosed to Facebook several pieces of

27   information regarding its patients' use of the Wisp Website, which included, but was not limited to

28   _____

[42] Cal. Civ. Code § 56.05(j).

---

the specific prescription medications they were purchasing.

73.     This patient information was derived from a provider of health care regarding patients' medical treatment and physical condition.  Accordingly, it constituted medical information pursuant to the CMIA.

74.     As demonstrated above, Defendant Wisp failed to obtain its patients' valid authorization for the disclosure of medical information.

75.     A valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization"; (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Cal. Civ. Code § 56.11(b). Accordingly, any information set forth in Defendant Wisp's Website Privacy Policy does not qualify as a valid authorization.

76.     Based on the above, Defendant Wisp violated the CMIA by disclosing its patients' medical information with Facebook, along with information sufficient to identify each individual patient.

77.     Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars, attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information.  Cal. Civ. Code § 56.35.  Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.  Cal. Civ. Code § 56.36.

**COUNT II**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**

78.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendants.

79.     The California Invasion of Privacy Act (the "CIPA") is codified at California Penal Code Sections 630 to 638.  The CIPA begins with its statement of purpose—namely, that the

purpose of the CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . ." Cal. Penal Code § 630.

80.    A person violates California Penal Code Section 631(a), if:
by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . .[43]

81.    Further, a person violates section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

82.    To avoid liability under section 631(a), a defendant must show it had the consent of all parties to a communication.

83.    At all relevant times, Wisp aided, agreed with, and conspired with Facebook to track and intercept Plaintiff's and Class Members' internet communications while using www.hellowisp.com to buy prescription medications. These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

84.    Wisp, while aiding and assisting Facebook's wiretapping, intended to help Facebook learn some meaning of the content in the URLs and the content the visitors requested.

85.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Tracking Pixel falls under the broad catch-all category of "any other manner":

a.    The computer codes and programs Facebook used to track Plaintiff and Class

---

[43] Cal. Penal Code § 631(a).

Members' communications while they were navigating www.hellowisp.com;

    b.    Plaintiff's and Class Members' browsers;

    c.    Plaintiff's and Class Members' computing and mobile devices;

    d.    Facebook's web and ad servers;

    e.    The web and ad servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.hellowisp.com;

    f.    The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.hellowisp.com; and

    g.    The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile device to visit www.hellowisp.com.

86.    At all relevant times, Facebook, though the Facebook Tracking Pixel, intentionally tapped or made unauthorized connections with, the lines of internet communications between Plaintiff and Class Members and Wisp's Website without the consent of all parties to the communication.

87.    Facebook, willfully and without the consent of Plaintiff and Class Members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class Members' communications to Wisp while the communications are in transit or passing over any wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class Members' communications and data with Wisp.

88.    Facebook used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

89.    By incorporating the Facebook Tracking Pixel onto the Website, Wisp aided, agreed with, employed, and conspired with Facebook to carry out the wrongful conduct alleged herein.

90.    The patient communication information that Wisp transmitted using the Facebook Tracking Pixel, such as information related to prescription medications, constituted protected

health information.

91.    As a result of the above violations, Defendants are liable to Plaintiff and other Class Members in the amount of $5,000 dollars per violation or three times the amount of actual damages, whichever is greater.  Additionally, California Penal Code Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

92.    Under the CIPA, Defendants are also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendants in the future.

**COUNT III**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**

93.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendant Facebook.

94.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication". .

95.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

96.    Plaintiff's and Class Members' communications to Wisp, including their sensitive personal and health information, such as information related to their prescription medications, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

97.    Plaintiff and Class Members expected their communications to Wisp to be confined to Wisp due to the confidential nature of those communications.  Plaintiff and Class Members did not expect third parties, specifically Facebook, to secretly eavesdrop upon or record this

information and their communications.

98.    Facebook's tracking technology, i.e., the Facebook Tracking Pixel, is an electronic amplifying or recording devices for purposes of § 632.

99.    By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to Wisp through this technology, Facebook eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

100.    At no time did Plaintiff or Class Members consent to Facebook's conduct, nor could they reasonably expect that their communications to Wisp would be overheard or recorded by Facebook.

101.    Facebook utilized Plaintiff's and Class Members' sensitive personal and health information for their own purposes, including for targeted advertising.

102.    Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

103.    Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, by Facebook, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class Members are accordingly entitled to injunctive relief.

<u>**COUNT IV**</u>
**Invasion of Privacy Under California's Constitution**

104.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendants.

105.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information;

and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

106.    At all relevant times, by using the Facebook Tracking Pixel to record and communicate patients' personal identifiers alongside their confidential medical communications, Defendants intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

107.    Plaintiff and Class Members had a reasonable expectation that their communications, identities, health information, and other data would remain confidential, and that Defendants would not install wiretaps on www.hellowisp.com.

108.    Plaintiff and Class Members did not authorize Defendants to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable and health information.

109.    This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

110.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy under the California Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    For a determination that this action is a proper class action;

b.    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.    For an order declaring that Defendants' conduct violated the statutes referenced herein;

d.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

e.    For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    For an order requiring Defendants to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

k.    For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated:  August 22, 204                     Respectfully submitted,

**BURSOR & FISHER, P.A**.


By: ___*/s/ Sarah N. Westcot*___
        Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006

Email: swestcot@bursor.com
sbeck@bursor.com

*Counsel for Plaintiff*